THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JAMES BRACEY, Defendant-Appellant.

First District (4th Division)    No. 79-1741

Opinion filed January 29, 1981.—Modified on denial of rehearing March 19, 1981.

Sam Adam, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Casimir Bartnik, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, James Bracey, was convicted of attempt (murder) (Ill. Rev. Stat. 1979, ch. 38, par. 8—4), aggravated battery (Ill. Rev. Stat. 1979, ch. 38,

par. 12—4), and armed violence (Ill. Rev. Stat. 1979, ch. 38, pars. 33A—1 through 33A—3). He was sentenced to a 13-year term in the penitentiary. The defendant appeals his conviction, alleging that (1) he was denied his constitutional rights to an impartial jury, due process of law, and the equal protection of the law where the State exercised its peremptory challenges to exclude from the jury all members of the defendant's race; (2) the court erred in denying the admission of the preliminary hearing transcript of a witness who invoked her fifth amendment right against self-incrimination or, alternatively, in refusing to compel the State to grant immunity to such witness; (3) the court erred in failing to suppress the use of the defendant's prior conviction of murder for purposes of impeachment; (4) the court erred in allowing the State to introduce certain out-of-court statements made by the victim; (5) the court unduly restricted the defendant's cross-examination of the State's only occurrence witness; (6) the State made several improper and prejudicial remarks during its closing argument; and (7) the court erred in refusing to give the missing witness instruction tendered by the defendant.

The defendant was accused of shooting Isaac Neal with a handgun on August 11, 1978. At trial Neal testified that he went to the defendant's house on the morning of August 11, 1978. They left in the defendant's car and spent most of the day "busting scripts." Neal explained that this meant they were attempting to fill prescriptions for drugs. Later, during cross-examination, Neal stated that he obtained the prescriptions from a doctor but was prevented from naming the doctor by a prosecution objection. While engaged in this activity, Neal and the defendant were joined by Ronald Mallette, Cecelia Walls and Dorshelle Sanders. At approximately 8 p.m., they stopped in a parking lot. The defendant pulled out a pistol, pointed it at Neal and said, "What is that that you are doing there. It sounds like I heard a gun." The defendant searched Neal while Ronald Mallette drove the car to the vicinity of 2700 South Dearborn. Neal testified that the defendant then forced him out of the car and shot him three times.

On cross-examination, Neal was asked whether he ever told the police that he and Cecelia Walls were in Ramsey's Tavern when the defendant came in, ordered them outside, robbed and shot Neal, and kidnapped Walls. Neal at first did not recall telling this story. Upon further questioning, Neal stated that he was never in Ramsey's Tavern on the day of the shooting. He denied hearing the kidnap story until that moment in court. The defense subsequently called Investigator Popovits, who testified that he and Assistant State's Attorney Melanie Vogl interviewed Neal at the hospital. During that interview, Neal told Popovits and Vogl that the defendant kidnapped Neal and Walls from Ramsey's Tavern. The State then cross-examined Popovits. Over an objection by

the defendant, Popovits stated that in a subsequent interview with Neal, Neal changed his story to conform to his present trial testimony. Popovits testified that Neal told him that he made up the kidnap story because he was afraid to tell the police about his "script busting" activities. On redirect examination, Popovits said that he made two police reports concerning his conversations with Neal. He admitted that neither of the reports contained Neal's "script busting" story. In rebuttal and over a defense objection, the State was permitted to call Assistant State's Attorney Melanie Vogl. Vogl testified that she was present during the hospital interview with Neal and that Neal stated he was with the defendant attempting to fill prescriptions on the date of the assault.

Outside the presence of the jury, the defendant called Dorshelle Sanders, who invoked her fifth amendment privilege against self-incrimination. The defendant informed the court that Sanders testified under oath at the preliminary hearing that she had shot Neal. The State cross-examined Sanders at the preliminary hearing. The defendant moved for the introduction of Sanders' preliminary hearing transcript and asked that it be read to the jury in the absence of her trial testimony. The court denied the motion. The defendant then moved that the court order the State to grant immunity to Sanders so she could testify as a defense witness. This motion was also denied.

The defendant next made a motion to suppress the use of his prior conviction for murder as impeachment evidence. He was convicted in 1966 and released from prison in 1976. The court refused to suppress the conviction, and the defendant decided not to testify.

During closing argument by the State, the State's Attorney made several comments which the defendant objected to as being improper and prejudicial. These remarks will be discussed later in detail.

At the conference on jury instructions the defendant submitted the following instruction:

> "If a party fails to call a person who possesses knowledge about the facts in issue, and who is reasonably available to him, and who is not equally available to the other party, then you may infer that the testimony of that witness is unfavorable to the party who could have called him and did not."

The defendant tendered this instruction because the State failed to produce Cecelia Walls and Ronald Mallette, and refused to grant immunity to Dorshelle Sanders. The court declined to give the instruction.

The defendant, a black, first contends that he was denied his sixth amendment right to an impartial jury and his fourteenth amendment rights to due process and the equal protection of the law because the State used its peremptory challenges to exclude from jury service all of the available black jurors. The record shows that on the agreement of both

parties, the court reporter was excused during the jury selection process. After 12 jurors and two alternates were chosen, the defense attorney moved for a mistrial on the ground that the jury selected did not constitute a representative cross-section of the community. He then injected the following facts into the record. The venire was composed of 35 jurors, nine of whom were black. Eight of the nine available black jurors were called into the jury box. The State used eight of its 10 peremptory challenges to strike these eight blacks from the jury panel. The State did not exercise any of its peremptory challenges against white jurors. The defense attorney then read into the record the names and occupations of the eight black jurors who were struck.

The trial court asked the State if it wished to respond to the defendant's motion for a mistrial. The State's Attorney said that he felt he had proper reasons for exercising the peremptory challenges as he did and denied being motivated by racism.

The court, relying upon *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, and *People v. Butler* (1970), 46 Ill. 2d 162, 263 N.E.2d 89, denied the motion, stating that the defendant "has [not] made out a case for invidious discrimination in violation of the Fourteenth Amendment."

In *Swain,* the defendant claimed that his fourteenth amendment rights to due process and the equal protection of the law were violated by the prosecution's exercise of peremptory challenges to exclude the six blacks remaining on his final jury venire. The court rejected this claim and stated that to establish a fourteenth amendment violation a defendant must show more than that blacks were excused from his jury through the State's use of peremptory challenges. He must show a systematic pattern, over time, of excluding a particular racial group from jury service. In reaching this decision, the *Swain* court relied heavily on the fact that the reasons for exercising a peremptory challenge are not subject to examination. The court stated that "[t]he essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control." 380 U.S. 202, 220, 13 L. Ed. 2d 759, 772, 85 S. Ct. 824, 836.

The Illinois courts have repeatedly expressed agreement with *Swain.* See *People v. Butler* (1970), 46 Ill. 2d 162, 263 N.E.2d 89; *People v. Attaway* (1976), 41 Ill. App. 3d 837, 354 N.E.2d 448; *People v. Thornhill* (1975), 31 Ill. App. 3d 779, 333 N.E.2d 8.

Although the defendant alleges that the prosecution's actions constituted a violation of the fourteenth amendment, it is clear that he has failed to establish the kind of systematic exclusion required by *Swain.* Recognizing this, the defendant urges us to adopt the reasoning of the California Supreme Court in *People v. Wheeler* (1978), 22 Cal. 3d 258, 583 P.2d 748,

148 Cal. Rptr. 890. The *Wheeler* court, relying on the California Constitution, held that the State's use of peremptory challenges based solely on group affiliation violated the defendant's right to a fair and impartial jury drawn from a representative cross-section of the community. *Wheeler*, like *Swain*, begins with the presumption that the State is exercising its peremptory challenges on constitutionally permissible grounds. However, *Wheeler* allows a defendant to rebut this presumption upon a lesser showing than that mandated by *Swain*. Under *Wheeler*, the defendant must establish the following three requirements:

> "First * * * he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias." (22 Cal. 3d 258, 280, 583 P.2d 748, 764, 148 Cal. Rptr. 890, 905.)

By way of illustration, the *Wheeler* court discussed the type of evidence which would be helpful to the defendant in establishing a *prima facie* case of discrimination.

> "[T]he party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic—their membership in the group—and that in all other respects they are as heterogenous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory *voir dire*, or indeed to ask them any questions at all. Lastly, * * * the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention." 22 Cal. 3d 258, 280-81, 583 P.2d 748, 764, 148 Cal. Rptr. 890, 905-06.

Once this showing has been made, it becomes incumbent upon the trial court to determine whether a reasonable inference arises that the State is exercising its peremptory challenges on the basis of group affiliation alone. If the court finds that this inference exists, the burden shifts to the State to show that it exercised its peremptories on grounds reasonably related to the particular trial or its parties or witnesses.

■■ In considering this issue, we are aware of the controversy which

exists on this court concerning the merit of the *Wheeler* rationale. (Compare *People v. Fleming* (1980), 91 Ill. App. 3d 99, 413 N.E.2d 1330 (where the court refused to apply the *Wheeler* decision, criticizing it as vague and uncertain) with *People v. Smith* (1980), 91 Ill. App. 3d 523, 414 N.E.2d 1117 (where the court indicated that it would not hesitate to adopt *Wheeler* in a proper case).) We do not feel that this is a proper case in which to decide whether the *Wheeler* rationale should be adopted in Illinois because we believe that the defendant has failed to establish a *prima facie* case of discrimination under the *Wheeler* standards. As noted above, *Wheeler* requires the defendant to make as complete a record of the circumstances as is feasible. Here the court reporter was excused during the *voir dire.* We therefore do not have a complete record of those proceedings. In *People v. Allen* (1979), 23 Cal. 3d 286, 590 P.2d 30, 152 Cal. Rptr. 454, decided after *Wheeler,* the court relied heavily on two factors in determining that the defendant established a *prima facie* case of discrimination. First, the prosecutor asked few or no questions of the black jurors. Second, the black jurors who were excluded possessed backgrounds and family contacts similar to white jurors with whom the prosecutor was satisfied. Without a record of the *voir dire,* we cannot preclude the possibility that the prosecutor, after questioning the eight black jurors who were struck, found them unqualified for reasons wholly unrelated to race. The importance of preserving a record of *voir dire* was recently emphasized by this court in *People v. Fleming* (1980), 91 Ill. App. 3d 99, 413 N.E.2d 1330. There, the court reporter was excused after only two black jurors had been struck. In holding that the defendants failed to establish a *prima facie* case of discrimination under *Wheeler* standards, the court stated that, "there being no court reporter present to record the proceedings, no record of the circumstances surrounding the State's exercise of its challenges exists and we cannot conclude that such challenges were exercised solely because the prospective jurors were blacks." 91 Ill. App. 3d 99, 107.

■■ We recognize that some courts have found that a defendant can rebut the presumption that the State is using its peremptory challenges properly simply by showing that it exercised a disproportionate number of its peremptories against blacks. (See *Commonwealth v. Soares* (1979), ___ Mass. ___, 387 N.E.2d 499, *cert. denied* (1979), 444 U.S. 881, 62 L. Ed. 2d 110, 100 S. Ct. 170.) However, we do not agree that the defendant can meet his burden of establishing a *prima facie* case of discrimination through the use of numbers alone. The peremptory challenge system would suffer severe detriment if the defendant could require the State to explain its reasons for striking jurors after meeting so minimal a burden.

The defendant next contends that the court erred in denying the admission of Dorshelle Sanders' preliminary hearing transcript after

Sanders invoked her fifth amendment privilege against self-incrimination. Sanders testified under oath at the preliminary hearing that it was she and not the defendant who shot Neal. The defendant claims that the refusal to read this testimony to the jury denied him his right under the Federal and State constitutions to compel witnesses in his behalf. U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8.

As support for this argument, the defendant cites *People v. Tennant* (1976), 65 Ill. 2d 401, 358 N.E.2d 1116, *cert. denied* (1977), 431 U.S. 918, 53 L. Ed. 2d 229, 97 S. Ct. 2184, and *People v. Horton* (1976), 65 Ill. 2d 413, 358 N.E.2d 1121. In *Tennant* and *Horton* the Illinois Supreme Court held that a transcript of the preliminary hearing testimony of a witness may be admissible where the witness is not available to testify at trial. The defendant asserts that Sanders' refusal to testify on fifth amendment grounds rendered her legally unavailable. The State disputes the applicability of *Tennant* and *Horton* because in both cases the witness was *physically* unavailable at trial. The State asserts that no Illinois court has accepted the proposition that a witness' invocation of a privilege renders that witness unavailable for purposes of admitting his preliminary hearing transcript.

■ We find it unnecessary to decide whether Sanders' refusal to testify rendered her unavailable. We believe that any error which may have resulted from the trial court's refusal to admit her preliminary hearing testimony was harmless. On August 15, 1978, Sanders had a conversation with reporter Russ Ewing in which she told Ewing she shot Isaac Neal. The following day, August 16, 1978, Sanders gave a statement to the police in which she denied shooting Neal. She told the police that she was asleep in the car at the time of the incident and therefore did not know who shot Neal. Sanders also told the police that the version she told Ewing was not factual and that she did not know why she told that story to Ewing. At the preliminary hearing on September 8, 1978, Sanders again testified that she shot Neal. She admitted that on August 16, 1978, she had told the police that she did not take part in the shooting.

In light of Sanders' prior statement to the police, we believe that her preliminary hearing testimony would have had little or no credibility before the jury. The judge at the preliminary hearing, who had the opportunity to observe the demeanor of the witness, apparently afforded her testimony very little weight. Despite the fact that Sanders claimed responsibility for the shooting, the judge entered a finding of probable cause against the defendant, James Bracey. Moreover no charges were ever brought against Sanders in connection with the shooting. We therefore do not believe that the refusal of the trial court to let the jury hear her preliminary hearing testimony, if error, constituted reversible error.

The defendant then argues that the court erred in refusing to compel the State to grant immunity to Dorshelle Sanders so she could testify as a defense witness.

The trial court clearly has the authority to grant immunity to a witness on the application of the State. (Ill. Rev. Stat. 1979, ch. 38, par. 106—1.) However, there is no obligation on the part of the State to offer immunity to a prospective defense witness "in order to gain relevant evidence for the defendant on direct examination." (*People v. Pantoja* (1976), 35 Ill. App. 3d 375, 381, 342 N.E.2d 110, 115.) In *Pantoja* the court relied upon language in *United States v. Ramsey* (7th Cir. 1974), 503 F.2d 524, where the court stated that a defendant does not have a constitutional right to compel the State to confer immunity upon a defense witness who has exercised his privilege against self-incrimination. Furthermore, in *People v. Frascella* (1980), 81 Ill. App. 3d 794, 401 N.E.2d 1045, it was held that Illinois courts have no inherent power to grant immunity to a witness in order to secure testimony which the defense deems relevant. We therefore conclude that the court acted properly in refusing to order the State to grant immunity to Dorshelle Sanders.

The defendant suggests yet another avenue of admissibility for Sanders' preliminary hearing testimony. He claims that even had Sanders not been under oath and subject to cross-examination, the out-of-court statement in which she admitted committing the offense is admissible under the due process clause of the fourteenth amendment. As authority for this argument, the defendant cites *Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038.

Generally, an extrajudicial statement by a third party that he committed the crime is inadmissible hearsay even though it is a declaration against interest. (*People v. Lettrich* (1952), 413 Ill. 172, 108 N.E.2d 488; *People v. Foster* (1978), 66 Ill. App. 3d 292, 383 N.E.2d 788.) In *Chambers*, the United States Supreme Court held that where the hearsay rule is applied mechanistically to exclude all declarations against penal interest, a violation of the defendant's right to due process may result. The court set forth the following four factors which would provide considerable assurance of reliability, thus justifying the admission of the extrajudicial statement: (1) the statement was made to a close acquaintance shortly after the crime occurred; (2) it was corroborated by other evidence in the case; (3) it was self-incriminatory and against the declarant's interest; and (4) the declarant was available for cross-examination by the State.

We do not believe that Sanders' statement satisfies the *Chambers* reliability factors. First, the statement was made to the police and not to a close acquaintance. Second, it was not corroborated by any other evidence in the case. Third, because Sanders implied that she shot Neal in

self-defense, it is not clear that the statement is truly against her penal interest. For these reasons, we reject the defendant's claim that *Chambers* mandates the introduction of Sanders' preliminary hearing testimony.

The defendant next contends that the court erred in failing to suppress the use of the defendant's prior conviction of murder for purposes of impeachment. He argues that the trial court misapplied the standards set forth in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695. In *Montgomery* the Illinois Supreme Court held that certain prior convictions may be admitted for impeachment purposes where the defendant was convicted or released from confinement within 10 years and where the court determines that the probative value of admitting the prior conviction is not substantially outweighed by the danger of unfair prejudice. *Montgomery* emphasized the trial court's considerable discretion in deciding whether a conviction within the 10-year time period may be introduced to impeach the defendant's credibility (47 Ill. 2d 510, 515, 268 N.E.2d 695, 698.) The court then suggested a number of factors which the trial court could consider in exercising its discretion. These factors include the nature of the prior crimes, the length of the defendant's criminal record, the age and circumstances of the defendant, and "above all, the extent to which it is more important to the search for truth in a particular case for the jury to hear the defendant's story than to know of a prior conviction." 47 Ill. 2d 510, 518, 268 N.E.2d 695, 699.

■■ The defendant argues that the trial court misapplied *Montgomery* by overemphasizing the defendant's lack of rehabilitation since his release from prison at the expense of other considerations such as the jury's need to hear the defendant's version of the story and the prejudicial impact of the conviction. While it is true that the trial court discussed the defendant's lack of rehabilitation, it is apparent from the record that the judge understood that he was to consider the jury's need to hear the defendant's testimony. In denying the defendant's motion to suppress the conviction, the trial judge stated,

> "Being within the 10 years, it's discretionary. And I am trying to follow *Montgomery* and the following cases after *Montgomery*. The various factors to be considered * * * [are] not just the necessity on the part of the defense to call a defendant to the stand, but * * * how long ago is the conviction, or in this case the release from the penitentiary so as to demonstrate that the defendant is in essence a new man * * *."

In *People v. Washington* (1973), 55 Ill. 2d 521, 523-24, 304 N.E.2d 276, 277, the Illinois Supreme Court stated that where the court shows its awareness of the *Montgomery* formula, "it would normally be assumed that a trial judge had given appropriate consideration to the relevant factors without requiring a specific evaluation in open court of each of them." Here the

defendant's prior conviction fell well within the time limit imposed by *Montgomery*. The similarity of the prior conviction to the charged offense does not automatically require its suppression. (*People v. Dee* (1975), 26 Ill. App. 3d 691, 325 N.E.2d 336.) We therefore cannot conclude that the trial court abused its discretion in refusing to suppress the defendant's prior conviction of murder.

The defendant next contends that the court erred in allowing the State to introduce hearsay evidence of prior statements made by the victim. Neal testified at trial that he was with the defendant "busting scripts" when the shooting occurred. On cross-examination, Neal denied ever telling anyone that the defendant kidnapped him from Ramsey's Tavern. The defense subsequently called Popovits who testified that Neal did indeed tell the Ramsey's Tavern story. The State was then permitted to elicit from both Popovits and Vogl that Neal had made prior out-of-court statements which were consistent with his trial testimony.

The State does not argue that Neal's prior out-of-court statements came under one of the exceptions to the hearsay rule. Rather, the State claims that these statements were used solely as evidence of Neal's credibility and not as substantive evidence of guilt. The defendant relies on *People v. DePoy* (1968), 40 Ill. 2d 433, 240 N.E.2d 616, in arguing that once a witness has been impeached by showing that he made out-of-court statements which contradicted his trial testimony, evidence of other previous statements which *agree* with his testimony are not competent. The reason for this rule was stated in *DePoy* as follows:

> "[W]hen a witness is impeached by the fact tht he has contradicted himself by relating the matter in a different way before trial, the admission of other evidence that he had made a pretrial statement at another time consistent with his testimony shows only that he had been making different statements about the same matter at different times, and this would in no way rebut the evidence of his unreliability which is imparted by proof of the prior inconsistent statement." 40 Ill. 2d 433, 439, 240 N.E.2d 616, 619.

■■ While we agree that the testimony of Popovits and Vogl concerning Neal's prior consistent statements was hearsay, we do not believe that the admission of his testimony was so prejudicial as to require reversal of the defendant's conviction. The charges against the defendant had nothing to do with either kidnapping or "script busting." Rather, they related solely to the shooting. The record shows that regardless of which story Neal told, he consistently identified the defendant as his assailant. The State's improper use of Neal's out-of-court statements thus constituted no more than harmless error.

The defendant next claims that the court unduly restricted his cross-examination of Neal by preventing the defendant from asking Neal the

name of the doctor who had written him certain prescriptions for drugs. After Neal testified that he had been with the defendant on the day of the assault attempting to fill prescriptions, the defendant asked Neal the name of the doctor who wrote those prescriptions. At that point, the prosecutor objected and the court sustained the objection. The defendant argues that by limiting cross-examination on this issue the court violated his right to confront witnesses.

■ It is well established in Illinois that the scope of cross-examination rests in the sound discretion of the trial court. A court of review will interfere only where there is a clear abuse of discretion resulting in manifest prejudice to the defendant. (*People v. Hayes* (1975), 32 Ill. App. 3d 953, 337 N.E.2d 280.) The defendant has failed to argue that the name of the doctor was in any way relevant to his defense. In the absence of a showing of manifest prejudice, we cannot conclude that the trial court abused its discretion.

The defendant next contends that the prosecutor violated his right to a fair trial by making several improper and prejudicial remarks during the closing argument. He claims that the remarks included references to inadmissible evidence, references to matters concerning which there had been no evidence, personal attacks upon the defendant and his attorney, references to the defendant's failure to testify and "thinly disguised" references to the defendant's criminal record. Specifically, the defendant asserts that it was error for the prosecutor to state that Neal "couldn't answer questions like * * * what were the names of the doctors" when, in fact, it was a prosecution objection which prevented Neal from naming them. The prosecutor then referred to Dorshelle Sanders as the defendant's girlfriend even though there had been no testimony to that effect. Also, the prosecutor called the defendant a "punk thug dog" and his attorney a "slick-talking lawyer." The prosecutor then made the following comment, which the defendant characterizes as both a reference to his failure to testify and an indication of his criminal record:

> "At least Isaac Neal had the guts, the courage to stand up to what he had done; and he came into this courtroom * * * and he stood on this witness stand. At least he told you his record."

The defendant objected to this last statement and requested a mistrial. The court sustained the objection and instructed the jury to disregard the remark. This caution was repeated in the jury instructions, where the court told the jury to "disregard testimony which the Court has refused or stricken" and to consider evidence that "consists only of the testimony of the witnesses which the Court had received."

The fact that the prosecutor makes improper remarks does not in and of itself mandate reversal of the defendant's conviction. (*People v. Mackins* (1974), 17 Ill. App. 3d 24, 308 N.E.2d 92, *cert. denied* (1975), 419

U.S. 1111, 42 L. Ed. 2d 808, 95 S. Ct. 786.) The defendant must show that the remarks resulted in substantial prejudice (*People v. Coleman* (1977), 51 Ill. App. 3d 499, 366 N.E.2d 1026), and that they constituted a material factor in the conviction. *People v. Shorter* (1978), 59 Ill. App. 3d 468, 375 N.E.2d 513.

■■ We are not persuaded that the remarks delineated by the defendant were so prejudicial as to require reversal of his conviction. It has been held that the court's action in instructing the jury to disregard improper remarks and in giving a curative instruction operates to cure any error. (*People v. Cox* (1979), 71 Ill. App. 3d 850, 389 N.E.2d 1238.) Also, in light of the totality of the evidence supporting the jury's finding of guilt, we do not believe that the prosecutor's statements constituted a material factor in the defendant's conviction. The defendant does not dispute the fact that Neal clearly and repeatedly identified the defendant as his assailant. We believe that the prosecutor's remarks constituted no more than harmless error.

The defendant's final contention is that the trial court erred in refusing to give the defendant's missing witness instruction. He claims that the instruction was proper because the State failed to call Cecelia Walls and Ronald Mallette and refused to grant immunity to Dorshelle Sanders. The requested instruction is as follows:

"If a party fails to call a person who possesses knowledge about the facts in issue, and who is reasonably available to him, and who is not equally available to the other party, then you may infer that the testimony of that witness is unfavorable to the party who could have called him and did not."

■■ We do not believe that the trial court erred in refusing to give this instruction. The State is not required to produce every witness to a crime in order to prove its case beyond a reasonable doubt. (*People v. Hayes* (1979), 70 Ill. App. 3d 811, 388 N.E.2d 818.) The testimony of a single witness, where positive and credible is sufficient to convict. (*People v. Clarke* (1971), 50 Ill. 2d 104, 277 N.E.2d 866.) Furthermore, as previously discussed, the State was under no obligation to grant immunity to Dorshelle Sanders. The missing witness instruction would have been misleading and was therefore properly refused. For the foregoing reasons, the convictions of the defendant are affirmed.

Affirmed.

ROMITI, P. J., and LINN, J., concur.